## BOONE *v.* LIGHTNER ET AL.

No. 698.   Argued May 3, 4, 1943.—Decided June 7, 1943.

*Mr. Milton I. Baldinger,* with whom *Messrs. Stuart H. Robeson, Roy L. Deal, J. G. Moser, I. Irwin Bolotin,* and *Clifford M. Toohy* were on the brief, for petitioner.

*Mr. M. R. McCown* for respondents.

MR. JUSTICE JACKSON delivered the opinion of the Court.

The federal question in this case is whether a stay of proceedings against a defendant in military service has been refused under circumstances which denied rights given by the Soldiers' and Sailors' Civil Relief Act of 1940. The controversy in which he was engaged is for state courts to settle, and we deal with the facts only as they relate to this federal question.

The petitioner Boone was summoned into a state court in North Carolina in an action to require him to account as trustee of a fund for his minor daughter, to remove him as trustee, to surcharge his accounts for losses caused by

illegal management, and to obtain personal judgment for deficiency in the fund.

Boone's mother-in-law, by will of which he was executor and trustee, created a trust fund for the education of her grandchildren, including one child of Boone's. Shortly after her death, and in September, 1938, another child was born to him. Since this child was unprovided for in the will, the father-in-law made arrangements which upon his death put into Boone's hands a fund of about $15,000. It is conceded that the fund was a trust for the benefit of the daughter. There was controversy whether it was governed, as Boone claimed, by a letter signed by the father-in-law which placed no restriction on his discretion; or, as Mrs. Boone, who has been sustained by the courts of North Carolina, claimed, by the same conditions as the testamentary trust set up by her mother. For our purposes it is enough that it was admittedly a trust and that grounds were alleged sufficient to move the state court to require an accounting.

The summons and complaint were served on Boone personally in North Carolina on June 23, 1941. He was then in military service of the United States as a Captain stationed in the office of the Under Secretary of War in Washington.

Boone filed a verified answer denying the jurisdiction of the court, claiming that on June 23, 1941, the same day the summons was served, he changed his "domicile and legal residence" to Washington, D. C., and his daughter's as well. He admitted receipt of the fund in trust, asserted the trust was governed by the letter referred to, and pleaded that he "is not bound to report to any Court." He denied all charges of misconduct of the fund, denied that there were grounds for apprehension that the funds were unsafe, and asserted that "he has exercised at all times good faith in caring for this fund." He also stated

that "he has not dissipated one penny of the fund, nor has he made any withdrawal from the fund since the day the money was turned over to him." He pleaded at length facts to support his claim that he was no longer domiciled in North Carolina and to support his allegation that the trust was "a voluntary trust not subject to the jurisdiction of any court or restricted in any way by the terms of any will."

On February 2, 1942, the cause came on for hearing. Boone moved for a continuance to the 25th of May, 1942, his counsel, Roy L. Deal, stating that he expected soon to be called into service and would be unable to try the case, and asking the continuance in order to give defendant ample time to employ other counsel. The request was granted, and that date peremptorily set for the trial. The court forbade transfer of securities constituting the trust and required that on the trial date they and any funds of the trust be turned over to the Clerk of the Court to abide further orders. Its order admonished that the court would at the earliest practical date ascertain the status of the trust fund and that the presence of Boone himself at the trial "is highly desirable," but left to the discretion of Boone and his counsel whether it was necessary. In order, however, to advise defendant Boone and his superior officers of the importance of the litigation, the court directed that a certified copy of the order be sent to The Adjutant General of the United States Army at Washington.

When the trial day came, Boone invoked the Soldiers' and Sailors' Civil Relief Act of 1940, and demanded that the trial be continued until after the termination of his service in the Army or until "such time as he can properly conduct his defense." At this time there were before the trial court not only the pleadings and the affidavits submitted by Boone and his counsel but also certain depo-

sitions which Boone had made and procured and which had been returned to the court, and also Boone's own statement of transactions which accompanied certain securities and funds which he turned over to the Clerk of the Court. Boone was not present, but counsel appeared for him to move for a further continuance under the Soldiers' and Sailors' Civil Relief Act. This motion was denied, counsel who had presented the motion withdrew from the case, and the trial proceeded. The verdict of the jury went against Boone; and judgment was entered that the trust was governed by the terms of the will, that Boone had been guilty of serious misconduct of the trust fund, and that he be held personally liable for the consequent loss to the trust fund of more than $11,000, and removed as trustee.

Boone then appealed to the Supreme Court of North Carolina, on the merits as well as on denial of the continuance, and that court affirmed. 222 N. C. 205, 22 S. E. 2d 426. As the decision below presented an important question of construction of the Act, we granted certiorari.

The section of the Soldiers' and Sailors' Civil Relief Act of 1940 principally invoked is § 201,[1] which reads:

"At any stage thereof any action or proceeding in any court in which a person in military service is involved, either as plaintiff or defendant, during the period of such service or within sixty days thereafter may, in the discretion of the court in which it is pending, on its own motion, and shall, on application to it by such person or some person on his behalf, be stayed as provided in this Act, unless, in the opinion of the court, the ability of plaintiff to prose-

---

[1] 54 Stat. 1178, 1181, 50 U. S. C. App. § 521.

We express no opinion on the question whether Boone could have the judgment opened upon proper application under § 200 (4), 50 U. S. C. App. § 520 (4).

cute the action or the defendant to conduct his defense is not materially affected by reason of his military service."

The positions urged by petitioner come to these: first, that defendant's military service in Washington rendered a continuance mandatory; second, if not mandatory, that the burden of showing that he could attend or would not be prejudiced by his absence was not on him, but on those who would force the proceedings; third, that the court did not make the finding required by the Act for denial of a stay; and last, that in any view of the law the trial judge abused his discretion in this case. The petition raises other questions, including the constitutional one as to whether he has been denied due process of law, which we do not discuss because in the light of the facts of the case they are frivolous.

1. The Act cannot be construed to require continuance on mere showing that the defendant was in Washington in the military service. Canons of statutory construction admonish us that we should not needlessly render as meaningless the language which, after authorizing stays, says "unless, in the opinion of the court, the ability of plaintiff to prosecute the action or the defendant to conduct his defense is not materially affected by reason of his military service."

The Act of 1940 was a substantial reënactment of that of 1918. The legislative history of its antecedent shows that this clause was deliberately chosen and that judicial discretion thereby conferred on the trial court instead of rigid and undiscriminating suspension of civil proceedings was the very heart of the policy of the Act.[2] While this Court

[2] As originally proposed, the Soldiers' and Sailors' Civil Relief Bill, S. 2859, 65th Cong., 1st Sess., provided in § 6 that:

"At any stage thereof any action or proceeding commenced in any court against a person in military service may, in the discretion of the

court in which it is pending, on its own motion, and shall, on application to it by such person or some person on his behalf, be stayed as provided in this act, unless, in the opinion of the court, the defendant is not embarrassed by reason of his military service."

Accompanying "Notes as to the Provisions of the Bill" stated that a "sweeping exemption" such as that provided by most States in Civil War days, was "too broad, for there are many cases where the financial ability of soldiers and sailors to meet obligations in some way is not materially impaired by their entrance into service." Hearings and Memoranda before Senate Judiciary Committee on S. 2859 and H. R. 6361, 65th Cong., 1st and 2d Sess., p. 27.

Major John H. Wigmore, one of the drafters of the bill, stated at the Senate hearings, that "a universal stay against soldiers is wasteful, because hundreds of them are men of affairs and men of assets, and they have agents back here looking after their affairs. There is no earthly reason why the court proceedings should stay against them. It is the small man, or perhaps I should say the humble man, who has just himself and no agent and no outside assets, that we do not want to forget. He is the man we are thinking of. These other people can take care of themselves, and the court would say to them, 'No; your affair is a going concern; go ahead with the lawsuit. You have a lawyer, you have an agent, you have a corporation manager, and other things.'" *Id.* at p. 97.

As reported by the House Judiciary Committee, H. R. 6361, 65th Cong., 1st Sess., provided in § 201:

"That at any stage thereof any action or proceeding commenced in any court against a person in military service during the period of such service or within 60 days thereafter may, in the discretion of the court in which it is pending, on its own motion, and shall, on application to it by such person or some person on his behalf, be stayed as provided in this act, unless, in the opinion of the court, the ability of the defendant to comply with the judgment or order sought is not materially affected by reason of his military service."

The House Report on this bill, No. 181, 65th Cong., 1st Sess., stated:

"Instead of a rigid suspension of all actions against a soldier, a restriction upon suits is placed only where a court is satisfied that the absence of the defendant in military service has materially impaired his ability to meet that particular obligation. Most of the actions sought to be brought against soldiers will be for small amounts and will thus

be in a local court where the judge, if he does not already know, will be in a favorable position to learn whether or not the defendant who seeks the benefit of the statute has really been prejudiced by his military service. Though not in military service, he may have property from which the income continues to come in irrespective of his presence; perhaps he may be some ne'er-do-well who only seeks to hide under the brown of his khaki; . . ." (p. 2.)

"The lesson of the stay laws of the Civil War teaches that an arbitrary and rigid protection against suits is as much a mistaken kindness to the soldier as it is unnecessary. A total suspension for the period of the war of all rights against a soldier defeats its own purpose. In time of war credit is of even more importance than in time of peace, and if there were a total prohibition upon enforcing obligations against one in military service, the credit of a soldier and his family would be utterly cut off. No one could be found who would extend them credit.

"But in any case a rigid stay of all actions against the soldier is too broad. There are many men now in the Army who can and should pay their obligations in full.

"On the other hand there are already tens of thousands of men in military service who will be utterly ruined and their families made destitute if creditors are allowed unrestrictedly to push their claims; and yet these same soldiers, if given time and opportunity can, in most cases, meet their obligations dollar for dollar. The country is asking 2,000,000 of its young men to risk their lives and, if need be, to give up their lives for their country. Before long even more will be asked to make the same sacrifice. Is it more than naked justice to give to the savings of these same men such just measure of protection as is possible?" (pp. 2–3.)

"Section 201 illustrates how the committee has avoided an arbitrary, a rigid bill. The clause 'unless, in the opinion of the court, the ability of the defendant to comply with the judgment or order sought, is not materially affected by reason of his military service,' is the key to the whole scheme of the bill. This mere fact of being in military service is not enough; military service must be the reason for the defendant not meeting his obligations." (p. 5.)

Congressman Webb, Chairman of the House Judiciary Committee, stated on the floor of the House, with reference to this bill, that:

"Heretofore during wars the various States have undertaken to pass the private stay laws for the benefit of the soldiers who are in the service of their country. If you will read the various laws of this kind which the committee has set out in its report, you will see what contrariety of such laws have been passed during recent years and during the various wars. The next material difference between this law and the various State laws is this, and in this I think you will find the chief excellence of the bill which we propose: Instead of the bill we are now considering being arbitrary, inelastic, inflexible, the discretion as to dealing out even-handed justice between the creditor and the soldier, taking into consideration the fact that the soldier has been called to his country's cause, rests largely, and in some cases entirely, in the breast of the judge who tries the case.

"Manifestly, if this Congress should undertake to pass an arbitrary stay law providing that no creditor should ever sue or bring proceedings against any soldier while in the military service of his country, that would upset business very largely in many parts of the country. In the next place, it would be unfair to the creditor as well as to the soldier. It would disturb the soldier's credit probably in many cases and would deny the right of the creditor to his just debts from a person who was amply able to pay and whose military service did not in the least impair his ability to meet the obligation." 55 Cong. Rec. 7787.

On the floor of the Senate, § 201 was amended to substitute for "the ability of the defendant to comply with the judgment or order," "the ability of the defendant to conduct his defense," and to extend its protection to plaintiffs as well as to defendants. 56 Cong. Rec. 1696, 1753–1754. The amendments were agreed to in conference, with the managers stating with respect to the former amendment that "As the bill passed the House relief was to be given the party in military service unless his ability to comply with the judgment or order sought was not materially affected by such service. The amendment agreed on makes the test depend upon his ability to conduct his defense." 56 Cong. Rec. 3023. As so amended, the Bill became § 201 of the 1918 Act, 40 Stat. 442, which was carried into § 201 of the 1940 Act without amendment of the provision under consideration. While it is true that the discussion set forth in the preceding paragraphs related to a stay on a different basis than the one enacted, in so far as it deals with the question whether a mandatory or a discretionary stay was intended it is not made inapplicable or uninstructive by the amendment.

had no occasion to speak on the subject, the Act was generally construed consistently with this policy.[3]

Reënacted against this background without reconsideration of the question beyond a statement in the Senate Committee Report that "There are adequate safeguards incorporated in the bill to prevent any person from taking undue advantage" of its provisions,[4] we are unable to ignore or sterilize the clause which plainly vests judicial discretion in the trial court.

2. The Act makes no express provision as to who must carry the burden of showing that a party will or will not be prejudiced, in pursuance no doubt of its policy of making the law flexible to meet the great variety of situations no legislator and no court is wise enough to foresee. We, too, refrain from declaring any rigid doctrine of burden of proof in this matter, believing that courts called upon to use discretion will usually have enough sound sense to know from what direction their information should be expected to come. One case may turn on an issue of fact as to which the party is an important witness, where it only appears that he is in service at a remote place or at a place unknown. The next may involve an accident caused by one of his family using his car with his permission, which he did not witness, and as to which he is fully covered by insurance. Such a nominal defendant's absence in military service in Washington might be urged by the insurance company, the real defendant, as ground for deferring trial until after the war. To say that the mere fact of a party's military service has the same significance on burden of per-

---

[3] *Davies & Davies* v. *Patterson*, 137 Ark. 184, 208 S. W. 592; *State ex rel. Clark* v. *Klene*, 201 Mo. App. 408, 212 S. W. 55; cf. *Swiderski* v. *Moodenbaugh*, 44 F. Supp. 687, 45 F. Supp. 790; *Dietz* v. *Treupel*, 184 App. Div. 448, 170 N. Y. S. 108; *Gilluly* v. *Hawkins*, 108 Wash. 79, 182 P. 958.

[4] Sen. Rept. No. 2109, 76th Cong., 3d Sess., p. 2.

suasion in the two contexts would be to put into the Act through a burden of proof theory the rigidity and lack of discriminating application which Congress sought to remove by making stays discretionary. We think the ultimate discretion includes a discretion as to whom the court may ask to come forward with facts needful to a fair judgment.

In the present case, whoever might have had the burden originally, the continuance was finally denied upon a record which disclosed the facts so far as either party saw fit to do so. The defendant and his counsel submitted affidavits and the depositions and accounts before the court revealed facts relevant to the issue.

Whether, if the court knew only the existence of this complicated controversy and that the defendant was absent in military service, it could have cast upon the defendant the burden of showing that the litigation could not go ahead without prejudice to him, is not before us. The court made no such ruling. The defendant appeared, he pleaded his defense, he took depositions showing fully what had happened to the fund, and he supplied his own affidavit showing where he was and what he was doing. Regardless of whether defendant was under a duty to make a disclosure of his situation, once he undertook to do so, the significance alike of what his affidavit said and of what it omitted was to be judged by ordinary tests. One of these is that "all evidence is to be weighed according to the proof which it was in the power of one side to have produced and in the power of the other side to have contradicted." *Cooper* v. *Dasher,* 290 U. S. 106, 109. The trial court and the Supreme Court of North Carolina did just this. They did not deny his stay because he failed to meet their ideas of burden; they weighed the evidence he offered and found its conclusions discredited by its avoidance of supporting facts within his knowledge and not within that

of his adversary. That is not a ruling on burden of proof. Finding that the courts below have proceeded upon no misapprehension of the law, we turn to their dealing with the facts of the particular case.

3. Some question is raised as to whether the findings of the trial court meet the requirements of the Act. In the order denying the continuance it found as a fact that "the defendant in this cause is deliberately and wilfully attempting to evade an ultimate determination of the issues involved in the litigation entitled as above, and is exercising his assumed right under the Act referred to above to avoid such determination." It also found the defendant "is not upon the motion for continuance acting in good faith." In the final judgment the court found as a fact "that the defendant has had ample time and opportunity to properly prepare his defense in this case and that his military service has not prevented him from doing this." It found that "defendant had full opportunity to prepare and put in his defense if he had one," and that "It is apparent that he has only sought to use the provisions of the Soldiers' and Sailors' Civil Relief Act as a shield for his wrong doing, and this Court, who once wore a U. S. uniform with pride, does not intend for this to be done."

Of course this is not a finding in the words of the statute that the ability of the defendant "to conduct his defense is not materially affected by reason of his military service," but there is no doubt that it was intended to be in substance the equivalent. It was so treated by the Supreme Court of North Carolina and to send the case back for further findings seems unwarranted. The Act does not expressly require findings. It is one intended to apply to courts not of record as well as those of record, and it requires only that the court be of opinion that ability to defend is not materially affected by military service. We

572

accept the findings as sufficiently evidencing the opinion of the court to that effect.

4. The final question is whether the evidence sufficiently supports the opinion or whether the order constitutes an abuse of discretion.

We think the opinion of the court that Boone's military service did not prevent him from being present and doing whatever could have been done by way of defense finds ample support in the evidence. Boone had been able to get away from Washington to go to New York for the taking of depositions on two separate occasions. He had long notice of the trial date and the court had placed in the files of his Department its order showing the desirability of his presence at that time. Boone, being a lawyer and presumably knowing the gravity of the accusations against him, might be expected to make some move to get leave to be present. If it were denied, he might be expected to expose every circumstance of his effort to the court in his plea for continuance. Boone's affidavit, after reciting that he was assigned to the International Division, Headquarters, Services of Supply, Washington, D. C., says "The work in said Division is very heavy, and full time and some extra time are required of all officers in said Division, including the defendant. Prior to the declaration of War on Dec. 8, 1941 the work in this Division was very heavy, but since the declaration of War the volume of work has been greatly increased. No leaves whatever have been granted, except in cases of serious emergency."

Most lawyers trained in the equity tradition of trustee fidelity would regard a trial of this kind as a serious emergency. Did he apply for a leave at all? The affidavit pretty clearly implied that he had not. We think the court had ample grounds for the opinion that Boone

made no effort to attend to duties that should weigh heavily upon the honor of a lawyer-trustee.

There was likewise support for the opinion that the failure to be represented by counsel did not result from Boone's military service. On February 2, 1942, the court granted his request for a continuance and set the case for trial on May 25, 1942. It was stated to the court that counsel then acting for him was expecting to be called immediately into military service, and it would be necessary for defendant to procure additional counsel. · Nevertheless, when the trial date arrived, the fact that this counsel had gone into service on May 13, 1942, was urged as a reason for further postponement. No showing whatever was made as to any effort to obtain other counsel in the long interval allowed by the court for the purpose. This counsel was also stationed at Washington and said he "would not assume to ask for leave at the present time, so soon after having reported for duty."

On the trial date defendant was nevertheless represented in court by local counsel. That counsel however was consulted only three or four days before the trial date and was employed for the sole purpose of making the motion for continuance, and when the court ruled on it he withdrew and declined to proceed further. The defendant's accounts presented to the trial judge showed disbursements since the beginning of the action and before trial for the following matters, among others, in connection with this case: On August 15, 1941, defendant's deposition was taken at Washington, D. C. This entailed a reporter's fee of $66.00 and a fee of $248.88 paid a Detroit attorney for appearing at the proceeding. On November 3 and 5, 1941, depositions were taken in New York City with the defendant present. These involved a court reporter's fee of $32.25, and fees in the amount of $375.00

for the Detroit attorney and New York counsel obtained to assist him. This item carried a notation that it did not "include services rendered in the taking of depositions in other cases on same date." From August 4, 1941, to January 26, 1942, Deal, the attorney who had represented defendant before withdrawing to accept a commission in Washington, received $218.00 for his services in representing defendant in the case. Two days after judgment, another lawyer from the firm of counsel who had withdrawn after making the motion of May 25 appeared and moved to set the verdict aside and took an appeal, later filing extensive assignments of error. Counsel who had withdrawn from the trial argued the appeal in the Supreme Court of North Carolina.

At all times since the action began defendant has also been represented by counsel from Detroit, Michigan. His inability to appear on the trial date was explained on the ground that he was "definitely engaged at the present time in the trial of cases at Detroit which will require his presence in Court there for approximately thirty days." No affidavit from this counsel was produced, and no explanation is made as to how it came that other "cases" were given priority over this in view of the long notice of the trial date and its importance to the client.

In this Court, Boone is represented by his Detroit counsel and by Deal, the lawyer who withdrew from the case to accept a commission in Washington. Besides these, there also appear four other lawyers, none of whom are included in the five who have represented him at previous stages in the case.

In addition to the facts presented to the trial court which we have recited, the trial court apparently considered matters not of record in this case, but of which he took judicial notice. He recites that "the motion to continue is made after the defendant's refusal in one or more instances arising out of litigation respecting the

subject matter and personnel involved in this action to appear in the Courts of North Carolina, even on citation for contempt." We know nothing of these events and disregard this ground of the court's action.

The court was dealing not only with an individual but with a trustee, one charged with default in his duty, and with a fund which was said to be in jeopardy. Defendant in spite of his military service in Washington was continuing to administer the fund. The defendant was a member of the bar, and the charges struck at his honor as well as at his judgment. Instead of seeking the first competent forum and the earliest possible day to lay his accounts out for vindication, he sought to escape the forum and postpone the day. He was both present and represented by counsel when depositions were taken which establish his speculation with the trust funds in his personal margin account. We think the record amply supports the conclusion of the trial judge that the claim that military service would prejudice the conduct of his defense, was groundless, and that the absence of himself and all of his numerous and not uncompensated counsel on the day of judgment was dictated wholly by litigious strategy.

The Soldiers' and Sailors' Civil Relief Act is always to be liberally construed to protect those who have been obliged to drop their own affairs to take up the burdens of the nation. The discretion that is vested in trial courts to that end is not to be withheld on nice calculations as to whether prejudice may result from absence, or absence result from the service. Absence when one's rights or liabilities are being adjudged is usually *prima facie* prejudicial. But in some few cases absence may be a policy, instead of the result of military service, and discretion is vested in the courts to see that the immunities of the Act are not put to such unworthy use.

*Affirmed.*

576

Mr. Justice Black, dissenting:

The petitioner is a soldier who was on duty in Washington throughout the course of the litigation in North Carolina of this action against him. He duly claimed the protection of the Soldiers' and Sailors' Civil Relief Act of 1940, and rests upon it here. I think he should prevail.

The relevant statutory provision before us may be summarized as follows: Actions brought against a person in military service shall be stayed upon application of that person "unless, in the opinion of the court, the ability of . . . the defendant to conduct his defense is not materially affected by reason of his military service."

The statutory language has no legislative history and has not previously been interpreted by this Court. The elaborate legislative history set forth by the Court is a history of a clause which was stricken from the 1917 Act, which is not before us now, and which, on its face, has a meaning wholly different from the clause under construction.[1] Hence the problem is a narrow one of analysis of the words of the statute itself.

I believe that the clause under consideration requires that an action against a person in military service must be

---

[1] The clause for which the Court gives the legislative history is as follows: An action against a person in military service shall be stayed, upon request, "unless, in the opinion of the court, the ability of the defendant to comply with the judgment or order sought is not materially affected by reason of his military service." This means, in rough substance, what its legislative history says, that the action was to be stayed except where the defendant could readily pay a judgment against himself. But that language was removed and the present provision inserted: the action upon proper request shall be stayed unless in the opinion of the trial judge, "the ability of the defendant to conduct his defense" is affected by military service. The difference between ability to pay a judgment and ability to conduct a defense is so great that the two clauses have substantially nothing in common. The ability to pay clause has been left in some sections of the Act, as, e. g., §§ 203, 206, but it is not before us here.

stayed unless the trial judge concludes (a) that no personal judgment will result and that the action will in effect preserve the interests of all the parties for the duration of the war; or (b) that the defendant is only a formal party; or (c) that the defendant need not be present for any purpose, either before, during, or after the trial, and that he will be adequately represented and has no need to testify or participate in any way; or (d) that the defendant's military service does not preclude him from having ample opportunity to get ready for, and to take his necessary part in, the litigation.

In my opinion, none of these conditions are met here. Although the action began as a proceeding to preserve the trust estate, which was quite proper, it terminated with a personal judgment against the petitioner for $11,000 after a trial by jury of many disputed facts. The petitioner was obviously not merely a formal party. One issue in the case was whether he had dissipated trust funds, and for such an inquiry his presence to hear the evidence against him was essential to his interests and his own testimony was, in the words of the trial court, "highly desirable."

The sole possible ground for the Court's action, therefore, is that the defendant could have been present and, wilfully taking advantage of the Act, chose instead to absent himself. In reaching this result the Court engages in precisely the speculation which I think the Act prohibits. The Court does not know, and the state court did not try to find out, whether Boone applied for a leave or disclosed its urgency to his superiors; it concludes that he did neither. The Court does not know whether Boone attempted to find new counsel; it assumes that he did not. The Court does not know why Boone chose to participate in certain other law suits against him conducted simultaneously with this one; it assumes that the others were less important than this case. The Court can not know

whether the petitioner truly owes the amount of the judgment against him; it must assume that he does because of a proceeding conducted against him in his absence.[2]

The Court emphasizes that Boone is a member of the bar. But, for the duration of the war, he is primarily a soldier, with a job to do which Congress intended should overshadow personal interests, whether his or those of others who seek a personal judgment against him. It is difficult for me to believe that he could adequately have prepared for this trial without a leave of many weeks. The purpose of the Act is to prevent soldiers and sailors from being harassed by civil litigation "in order to enable such persons to devote their entire energy to the defense needs of the Nation." § 100. He is required to devote himself to serious business, and should not be asked either to attempt to convince his superior officers of the importance of his private affairs or to spend his time hunting for lawyers.

The trial court should, at the very least, have inquired of the appropriate military authorities whether the petitioner could be granted ample leave to prepare his defense and be present for trial. If the Act does not require this, it serves little purpose. It may be argued that this petitioner, a man of knowledge and experience, is as competent to ask his superior officer for leave as is the trial court; but the argument fails because the policy set here, no matter how many qualifications the Court tries to work into it, will shoot far beyond the confines of this case. In the course of the war, numerous actions will be brought against soldiers who have never heard of this Act and have no notion that this Court might want them to apply to

---

[2] Had this been a judgment by default, Boone might have it set aside upon proper motion made at any time within "ninety days after the termination" of his military service. § 200 (4). Whether that section will permit Boone to attack this judgment after the war is a question which the Court expressly reserves.

their superior officers for leave and to make and file a formal record of their superior officers' refusal.

I fear that today's decision seriously limits the benefits Congress intended to provide in the Soldiers' and Sailors' Civil Relief Act. It apparently gives the Act a liberal construction for the benefit of creditors rather than for the benefit of soldiers. It places in trial judges an enormous discretion to determine from a distance whether a person in military service has exercised proper diligence to secure a leave, or whether it is best for the national defense that he make no application at all. These are questions on which the judiciary has no competence, since only the military authorities can know the answers.